IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICIA FRITZ,

      *Plaintiff,*

    v.

WESTMORELAND COUNTY, *et al,*

      *Defendants.*

Civil Action No. 2:19-cv-1517

Hon. William S. Stickman IV

### **MEMORANDUM OPINION**

William S. Stickman IV, United States District Judge

Plaintiff Patricia Fritz ("Fritz"), who worked in the Westmoreland County Sheriff's Office ("Sheriff's Office"), has brought claims against Westmoreland County ("County") for: Count I - sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981; Count II - retaliation under Title VII; Count III - age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 634 *et seq.*; Count IV - sex discrimination under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); Count V - retaliation under the EPA, 29 U.S.C. § 215(a)(3); Count VI - sex discrimination under 42 U.S.C. § 1983; and, Count VIII - sex and age discrimination and retaliation under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA"). The County filed a Motion for Summary Judgment. (ECF No. 92). For the reasons explained below, the Court will grant the motion.

## I.   FACTUAL BACKGROUND

On November 6, 2010, Fritz was hired by Westmoreland County as a part-time deputy in the Sheriff's Office.[1]  She was in charge of the gun permit and license to carry sections. Jonathan Held ("Held"), who was elected Sheriff in Westmoreland County, took office in January 2012.  From 2012 to 2014, Paul McCommons ("McCommons") served as Chief Deputy Sheriff.  McCommons resisted most of Held's proposed changes to the Sheriff's Office, and McCommons had a "if it ain't broke, don't fix it" mindset.  McCommons left the Sheriff's Office in 2014, and Fritz was appointed by Held to the position of Chief Deputy Sheriff on May 5, 2014.  During her interview, Held conveyed that he needed a Chief Deputy Sheriff who would be strict and enforce the rules.  The Sheriff's Office had between forty-five and fifty-six employees. Fritz's appointment was pursuant to Held's statutory authority as Sheriff under 16 P.S. § 1203,[2] and she served at his pleasure.  Her annual salary, $41,675.87, was about the same as that of McCommons.  Fritz did not get overtime, and she was an exempt employee.  Fritz's duties and responsibilities included managing the Sheriff's Office's budget, implementing and updating department policies in accordance with law and county guidelines, training new deputy units,

---

[1] Fritz retired from the Military and Veteran's Affairs in 2010 having served seven years as an Administrative Officer and Real Property Specialist.  She previously held a position with PennDot for twenty-three years.  (ECF No. 105, p. 19); (ECF No. 112, p. 1).

[2] 16 P.S. § 1203 states in pertinent part:

> **(a) Appointment** - The sheriff of each county shall appoint, by commission duly recorded in the office for recording deeds, a chief deputy whose appointment shall be revocable by the sheriff on recording in the office for recording deeds a signed revocation. The chief deputy, during continuance in office, shall have full power and authority to perform any duty incumbent upon the sheriff, with like effect in law as if such official act had been done by the sheriff in person, regardless of the ability or temporary disability of the sheriff to act, while the sheriff continues in office.

16 P.S. § 1203(a).

2

and general managerial and supervisory duties.  (ECF No. 96, pp. 18, 23); (ECF No. 108, pp. 27, 36, 41-44); (ECF No. 115, pp. 2-4, 6).

According to Fritz, immediately after her appointment, many of the male deputies were hostile towards her and refused to follow changes she attempted to implement.  (ECF No. 96, p. 19) (ECF No. 108, pp. 29, 43); (ECF No. 115, p. 5).  Corporal Felder ("Felder"), expressed his contempt of Fritz to Held, stating on one occasion, "I can't believe you put a fucking woman in charge of us."  (ECF No. 108, p. 43); (ECF No. 115, p. 5).  Other men in the Sheriff's Office were allegedly insubordinate to Fritz because they believed a woman should not be in charge of them.  Also, they allegedly believed her budgetary savings were to their financial detriment. (ECF No. 108, p. 43); (ECF No. 115, pp. 5-6).  Held witnessed instances of hostility against Fritz and she reported other instances of male hostility to him.[3]  (ECF No. 108, p. 43); (ECF No. 115, p. 6).

Fritz received the Westmoreland County policies prohibiting Workplace Violence, Sexual Harassment, and Non-Discrimination as well as its Code of Ethics.  (ECF No. 96, p. 18-21); (ECF No. 108, pp. 28, 30-32).  The Westmoreland County Workplace Rules applied to Fritz, and, as to "Definition of Major Rule Violations," it stated in pertinent part:

> Major offenses are any violations of Office safety rules of such a degree that continued employment of the individual may not be desirable.  Major rule violations including the following, are examples of some offenses which may subject an employee to immediate suspension or discharge without warning:
>
> \*                    \*                    \*
>
> 10. Verbal altercations or physical altercations are strictly prohibited.
>
> \*                    \*                    \*
>
> 18. Investigation, arrest and/or conviction of criminal charges.

---

[3] Held was the subject of multiple sex discrimination complaints/lawsuits by women in the Sheriff's Office prior to 2018.  (ECF No. 61); (ECF No. 115, pp. 38-39).

If a violation of the Workplace Rules occurs, the matter is investigated before an employee is terminated.  (ECF No. 96, p. 18) (ECF No. 108, pp. 27-28); (ECF No. 95-30).  As to the Sheriff's Office, Article V(5) of its Policy Manual, which addresses "General Rules and Regulations," states that:

> §2 OBEDIENCE TO ORDERS—LAWS
>     A. Personnel of the Sheriff's Office must obey and enforce all:
>         1) Federal, State, and Local laws and Ordinances when directed or practical
>         2) Rules, regulations, policies, memorandums, and procedures of the Sheriff's Office.
>         3) Lawful orders issued by a superior officer or supervisor whether they are written or oral.
>                     *                *              *
> §4 CONDUCT UNBECOMING
>     A.    Any conduct by personnel on or off duty that may reflect negatively upon the department. All personnel must at all times conduct themselves in a manner which does not bring discredit to themselves or the reputation of the Sheriff's Department.
>     B.    These written rules, regulations, or policies are not to be construed as the only guidelines for unacceptable behavior.

(ECF No. 96, p. 20); (ECF No 108, p. 30); (ECF No. 95-34).

Pursuant to 16 P.S. § 1620,[4] Fritz's salary was set by the Westmoreland County Salary Board ("Salary Board").  It does not set salaries based upon performance or merit.  Held sent a

---

[4] 16 P.S. § 1620 provides in pertinent part:

> Provided, however, that with respect to representation proceedings before the Pennsylvania Labor Relations Board or collective bargaining negotiations involving any or all employees paid from the county treasury, the board of county commissioners shall have the sole power and responsibility to represent judges of the court of common pleas, the county and all elected or appointed county officers having any employment powers over the affected employees. The exercise of such responsibilities by the county commissioners shall in no way affect the hiring, discharging and supervising rights and obligations with respect to such employees as may be vested in the judges or other county officers.

16 P.S. § 1620.

March 6, 2017, letter to the Salary Board requesting a $10,000.00 raise for Fritz because he believed she was not fairly compensated.  The attached documentation was gathered by Fritz, and she sought to make her salary consistent with the Chiefs of Staff for the Commissioners, the Prison Deputy Warden of Security, the Prison Deputy Warden of Treatment, and the Park Police Chief Deputy.[5]  Held could facilitate compensation changes in his office by making a request to the Salary Board, which consists of three Commissioners[6] and the Controller.  Thereafter, Held would meet in an executive session with the Salary Board to discuss his compensation request.  Following the executive session, at a public meeting, Held would make a motion to call the compensation request to a vote.  When a request for an employee of the Sheriff's Office is before the Board, the Sheriff also receives a vote, for a total of five votes.  The Salary Board denied Held's request for Fritz's salary increase in its executive session.  Held did bring it to a public vote.  (ECF No. 96, pp. 21-22, 24-24); (ECF No. 108, pp. 32-33, 44-45); (ECF No. 115, pp. 7-9).

On January 24, 2018, Held submitted a second request to the Salary Board seeking to increase Fritz's compensation by $10,000.00.  In addition to a pay raise for Fritz, Held's request included a restructuring of the Sheriff's Office, elimination of the Captain position, and a raise for other employees.  Held spoke with each of the Salary Board members regarding his request, and he determined that he did not have support.  Because of the lack of support, he withdrew his

---

[5] Men held the positions in the other County departments she referenced, and they made approximately $10,000 to $27,734 more per year.  (ECF No. 96, p. 22); (ECF No. 108, p. 33-34).  All row offices similar to the Sheriff's Office–i.e., the Treasurer, the Recorder of Deeds, the Register of Wills, the Coroner, the Prothonotary, and the Clerk of Courts–had Chief Deputy positions and those positions fell under the same pay step, or pay grade, as the Chief Deputy of the Sheriff's Office.  (ECF No. 95-10, pp. 10, 28-29); (ECF No. 95-39).  Steps differed if different work rules applied, if a Chief Deputy was promoted from another County position with a higher salary, or if the Salary Board gave an annual increase.  (ECF No. 96, p. 22); (ECF No. 108, p. 34).

[6] At the time of the events at issue here, the Commissioners were Ted Kopas, Gina Cerilli and Charles W. Anderson (collectively referred to as "Commissioners").

request prior to the executive session.  Held eventually hired a new Captain, and Fritz's salary was not increased.  (ECF No. 96, p. 24); (ECF No. 108, pp. 37, 45-46); (ECF No. 115, pp. 9-10).

On February 7, 2018, Assistant Solicitor David Regoli ("Regoli") came to the Sheriff's Office and requested a private meeting with Fritz.  Regoli presented Fritz with two letters, dated February 6, 2018, from an attorney representing two individuals setting forth allegations of discrimination against Fritz for her employment and/or supervisory decisions, and threatening lawsuits if she was not fired.  According to Fritz, Regoli accused her of discrimination and threatened her employment status.  She also claimed that he physically assaulted her, and that all of his conduct was a violation of the County's Workplace Violence Policy.  Due to Fritz's allegations about Regoli's conduct, Held requested the County investigate the incident, which he classified as a complaint of workplace harassment.  The next day, on February 8, 2018, Regoli received a third letter from the attorney setting forth similar allegations of discrimination by Fritz as those contained in the first two letters.  Regoli launched an investigation into the discrimination allegations lodged against Fritz.  Ultimately, his investigation was never completed as the individuals filed federal lawsuits that the County settled.  (ECF No. 96, pp. 11-17); (ECF No. 108, pp. 18-26); (ECF No. 115, pp. 10-14, 17).

On February 9, 2018, Fritz sent an email to Solicitor Guiddy about her February 7, 2018, interaction with Regoli stating his questions were "threatening and interrogating," she was uncomfortable, she "felt threatened and intimidated," and she was "harassed and maligned for no reason."  (ECF No. 95-27).  In a February 9, 2018 letter, the Commissioners requested that Held suspend Fritz due to the discrimination complaints on the basis that the County's Non-Discrimination Policy stated that employees who allegedly conducted themselves in a discriminatory manner were to be "indefinitely suspended pending the outcome of the

6

investigation." The Commissioners also released a statement to the media requesting Fritz's suspension. Held refused to suspend Fritz. (ECF No. 95-28); (ECF No. 96, pp. 15-16); (ECF No. 108, pp. 23-24, 49); (ECF No. 115, pp. 14, 16).

The County began investigating and monitoring Fritz's whereabouts, and it pulled surveillance video footage to track her movements. (ECF No. 108, p. 48); (ECF No. 115, p. 15). It hired Attorney Tom McGinnis ("Attorney McGinnis") to investigate Fritz's allegations against Regoli. When he attempted to interview Fritz, she referred him to her attorney. Attorney McGinnis was never able to conduct an interview of Fritz. He issued a June 28, 2018, report detailing his investigation and conclusion that Regoli had not violated the County's Sexual Harassment or Violence in the Workplace policies. He noted that Fritz's refusal to be interviewed was a potential violation of the County's Sexual Harassment Policy, and she violated the Violence in the Workplace Policy by failing to immediately report to Human Resources ("HR") or the Park Police the alleged physical contact with Regoli. (ECF No. 95-29); (ECF No. 96, pp. 16-17); (ECF No. 108, pp. 24- 26).

In February 2018, Fritz requested medical leave, and approval was granted by Held and the County. During her leave, Fritz filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on February 21, 2018, against the Commissioners and Regoli as well as a complaint with the Pennsylvania Office of Disciplinary Counsel against Regoli. Her complaints were based on the February 7, 2018, incident with Regoli. On February 21, 2018, she filed a complaint with PHRC against the Commissioners and Regoli. On March 3, 2018, she amended her EEOC complaint to include a claim of unequal pay based on gender

discrimination.[7]  (ECF No. 96, pp. 11, 16); (ECF No. 108, pp. 18, 24, 49); (ECF No. 115, p. 16-17, 39-41).   On March 27, 2018, the Commissioners wrote to Pennsylvania senators and requested Fritz's removal from office based on the discrimination complaints against her.   No senators investigated or took action on the Commissioners' request.  (ECF No. 108, p. 50); (ECF No. 115, pp. 17, 39-42).   On June 6, 2018, Fritz supplemented her EEOC complaint to include claims of sex discrimination and unequal pay.  (ECF No. 108, p. 61); (ECF No. 115, p. 40).

On August 7, 2018, Fritz met with Felder, Deputy Orbin ("Orbin"), and Denise Appleby ("Appleby") about Orbin taking a work vehicle home.   After that issue was resolved, Corporal Felder wanted to discuss the sick leave policy with Fritz.   He told Fritz that he disagreed with the policy and he was going to instruct his deputies not to listen to the guidelines.   At some point, Felder, who was approximately six feet tall and weighed between 250 and 300 pounds, allegedly began yelling at Fritz. According to Fritz, when Felder began to exit the room, she met him at the door and demanded, as his superior,[8] that he sit down.   Felder allegedly swung open the metal door and pinned Fritz behind the door.   Held heard Felder yelling and entered the room and had an exchange with Felder.   The men then proceeded to the HR Office where Held turned the matter between Fritz and Felder over to HR to investigate.   Held suspended Felder and directed the Park Police to take Felder's firearm and escort him off the premises.   Felder's behavior caused Held to fear for his safety and the safety of others.  (ECF No. 96, pp. 3-4); (ECF No. 108,

---

[7] In June, she amended her EEOC charge to include claims for sex discrimination and equal pay. In August, Fritz again amended it to include claims of sex and age-based discrimination, and retaliation.   In October, she amended and supplemented her claim to include retaliation.   On April 12, 2019, Fritz filed three additional EEOC complaints.   One was against the Sheriff's Office, one was against the County Commissioners, and one was against the County.  (ECF No. 108, pp. 61-62); (ECF No. 115, pp. 39-41).

[8] In actuality, Fritz did not have any hiring or disciplinary authority over Felder, or any of the deputy sheriffs.  (ECF No. 96, p. 4); (ECF No. 108, p. 6).   Felder was the Union President for the Sheriff's Office, and he had a supervisory role in the office.  (ECF No. 108, pp. 59-60); (ECF No. 115, p. 36).

pp. 4-5, 50-51); (ECF No. 115, pp. 18-20).  Later that day, Held, Fritz, and Appleby provided statements to HR about the incident.  (ECF No. 108, p. 52); (ECF No. 115, p. 21).

In the ensuing days, Felder alleged that Fritz poked him in the chest during the August 7, 2018, meeting.  Fritz denied Felder's allegations.  Held was called by the Commissioners to a meeting to discuss Felder's allegations against Fritz wherein he learned that the Commissioners viewed Felder, and not Fritz, as the victim.  The Commissioners stated that Fritz was going to be banned from County property for violating workplace policy.  Held denied the accuracy of Felder's allegations against Fritz.  (ECF No. 108, p. 52); (ECF No. 115, pp. 21-23).  After the meeting, Held received a hand-delivered letter from the Commissioners dated August 10, 2018, stating in pertinent part,

> This week the Westmoreland County Human Resources office received a number of complaints against Chief Deputy Patricia Fritz. These allegations concern possible physical violence on her part, as well as conduct unbecoming of any County employee, let alone a management employee, in front of members of the general public. Human Resources has begun an internal investigation into these accusations.
> The Commissioners join together in their concern over the gravity of the seriousness of these allegations and are calling upon you to indefinitely suspend Chief Deputy Patricia Fritz with pay immediately pending the outcome of the investigation. An employee suspension would require Chief Deputy Fritz not to be on County premises and to return County property, including her swipe card, vehicle, gun, uniforms and badge, etc.
> *       *       *
> In light of these policies and the allegations, the Board of Commissioners urge you to cooperate with us in our request to suspend Chief Deputy Fritz pending the outcome of the investigation. Otherwise, the County will take all appropriate steps consistent with County policies and practices to ensure that these standards are upheld and to ensure the safety of County employees and visitors while on County property.

(ECF No. 109-74).   Held, pursuant to his authority under 16 P.S. § 1203, issued an indefinite paid suspension to Fritz on August 10, 2018.  (ECF No. 108, p. 53); (ECF No. 115, p. 24).  Also

that same day, the County's Director of HR, Amanda Bernard ("Bernard"), sent Fritz a letter

stating in pertinent part:

> This week the Westmoreland County Human Resources office received a number of complaints concerning possible physical violence on your part, as well as conduct unbecoming of any County employee, let alone a management employee, in front of members of the general public. Human Resources has begun an internal investigation into these accusations.
>
> Due to the gravity of the seriousness of these allegations you are not permitted to be on County premises or attend County functions pending the investigation. You are required to return County property, including your swipe card, vehicle, gun, uniforms and badge, etc. During this time, you will continue to be paid.

(ECF No. 109-43). Prior to Fritz, the Commissioners had never banned a County employee from

County property. (ECF No. 108, p. 61); (ECF No. 115, p. 39). Fritz's County vehicle was

confiscated by the Park Police on August 11, 2018. (ECF No. 96, p. 4); (ECF No. 108, pp. 7-8,

54); (ECF No. 115, p. 26). Also, on August 11, 2018, Held informed Fritz that Felder had filed a

complaint against her, the County wanted to suspend her, and he was waiting for additional

information from his solicitor. On August 12, 2018, Fritz called Held to ascertain her

employment status, and Held told her to take a sick day on Monday. (ECF No. 96, p. 5); (ECF

No. 108, p. 8). Then, on Monday, August 13, 2018, Fritz claims she learned from news reports

that she had been suspended. (ECF No. 96, p. 5); (ECF No. 108, pp. 9, 54); (ECF No. 115, p.

26).

By letter dated August 13, 2018, Bernard further instructed Fritz:

> An action form was signed by Sheriff Held, suspending you with pay, effective August 10, 2018. Due to the gravity of the seriousness of these allegations you are not permitted to be on County premises or attend County functions pending the investigation. It is my understanding that you have already returned your badge and swipe card (County identification) to the Sheriff and that the County vehicle has been obtained. I would ask that you make arrangements to return any additional County property that you may have in your possession.

(ECF No. 109-44). Thus, the County banned Fritz indefinitely from all County property until its investigation into the August 7, 2018, incident was complete. (ECF No. 115, pp. 25-26); (ECF No. 108, pp. 53-54).

On August 16, 2018, Fritz amended and supplemented her EEOC complaint to include claims of sex and age discrimination, and retaliation. (ECF No. 105, p. 36); (ECF No. 112, p. 9).

A non-traffic citation was issued by Officer Gardner on August 22, 2018, against Fritz for a violation of 18 Pa. C.S.A. § 2709(a)(1), harassment, for the August 7, 2018, incident with Fritz after Felder filed a private criminal complaint. (ECF No. 109-65); (ECF No. 108, p. 55); (ECF No. 115, p. 27). Fritz filed a private criminal complaint against Felder on August 24, 2018, alleging he assaulted and harassed her on August 7, 2018, but it was never adopted for prosecution by the Commonwealth of Pennsylvania. (ECF No. 109-27); (ECF No. 96, pp. 5-6); (ECF No. 108, pp. 9-10, 55); (ECF No. 115, p. 27).

HR wanted to meet with Fritz in late August, and Held encouraged her to go to the meeting. Fritz, however, believed that her perspective was covered when she was interviewed by County detectives regarding the incident with Felder, and she did not want to answer any further questions. (ECF No. 96, p. 6); (ECF No. 108, pp. 10-11). HR then sent Fritz an August 31, 2018, letter stating in pertinent part:

> This letter is in follow up to the letter sent to you on August 13, 2018. As you are aware, the Westmoreland County Human Resources office received a number of complaints concerning possible physical violence on your part, as well as conduct unbecoming of any County employee, let alone a management employee, in front of members of the general public. Human Resources has begun an internal investigation into these accusations.
>
> On August 7, 2018, it is alleged that you yelled at, pushed and poked an employee following a meeting. It's also alleged that you blocked the employee from leaving the room. It is alleged that you then yelled at and followed the employee through public areas. On August 22, 2018, you were charged with a citation for harassment. As you are aware, this alleged behavior would constitute

a violation of the Westmoreland County Workplace Violence Policy and the Westmoreland County Code of Ethics. In addition, the behavior and charge of harassment is a violation of the Westmoreland County Sheriffs Policy Manual in regards to Article V, Section 2 and Section 4.

The County has a responsibility to take all reasonable steps to ensure that County security and workplace standards are upheld and to ensure the safety of County employees and visitors while on County property.

On August 27, 2018, you were scheduled to meet with Human Resources in regards to these allegations. When you did not show for the meeting, I contacted you to find out if you were coming to the meeting. You stated that the Sheriff told you not to attend and that you do not answer to Human Resources. You told me to "take it up with your boss." I informed the Sheriff of our conversation and he stated that he encouraged you to attend with the approval of your attorney. He further stated that you informed him that your perspective was covered when you interviewed with the County Detectives. Please be advised that our investigation is separate from the County Detectives and Human Resources must pursue its own independent investigation into these allegations.

I am providing you with an additional opportunity to meet on Tuesday, September 4, 2018 at 1pm at the Westmoreland County Human Resources Office. At this meeting, you may respond verbally and/or in writing to the above allegations. Please report to Park Police prior to reporting to Human Resources.

(ECF No. 95-11). On September 10, 2018, Fritz met with HR and provided her version of

August 7, 2018's events. (ECF No. 108, p. 55); (ECF No. 115, p. 28).

The attorney investigator hired by the County concluded her investigation on September

19, 2018, and submitted her recommendation to the County on October 1, 2018. (ECF No. 96,

pp. 7-8); (ECF No. 108, pp. 13-14). She advised:

I recommend that Fritz be invited to a Loudermill hearing to respond to concerns about her conduct. Specifically, the investigation revealed credible and corroborated evidence/testimony that Fritz blocked Felder from leaving the meeting room and that she pushed and poked him during the exchange. Fritz's conduct, provided she does not provide exculpatory information during the Loudermill hearing, should result in her termination.

My recommendation as to Fritz is based on my understanding that Fritz is not part of a collective bargaining unit and has no "property interest" in her employment. She is an at-will employee who serves at the pleasure of Sheriff Held. I am aware, however, that Fritz has a pending EEOC claim and likely her

termination will result in an additional charge or modification of her existing claims (adding a retaliation claim).  To that end, there is a legitimate basis for the County to take action against Fritz (which is not retaliatory).  When we met, we discussed whether there were other circumstances, that were similar in nature, but resulted in less of a disciplinary penalty.  There are no similar comparable situations.

(ECF No. 95-15); (ECF No. 109-64).

On October 2, 2018, Fritz was found guilty of summary harassment relating to the August 7, 2018 incident with Felder.[9]  (ECF No. 108, p. 56); (ECF No. 115, p. 29).  During her suspension, other employees lodged complaints with HR about alleged incidents they had with Fritz.  (ECF No. 96, p. 9); (ECF No. 108, pp. 14-15).  HR sent Held a letter dated October 15, 2018, noting that independent counsel recommended terminating Fritz, Held delegated the authority on Fritz's job status to HR, and that it was the County's intention to terminate Fritz. HR requested Held sign the personnel action form terminating Fritz.  (ECF No. 109-67).  Held, through an October 16, 2018, letter from his solicitor, asked the County whether Fritz had been provided an opportunity to resign.  (ECF No. 108, p. 56); (ECF No. 115, p. 30).  Fritz, however, never told anyone she wanted to resign.  In fact, she wanted to continue her tenure.  (ECF No. 96, p. 25); (ECF No. 108, p. 38).

HR, by October 22, 2018 letter, notified Fritz that a *Loudermill*[10] hearing was scheduled for October 25, 2018, at which time she would "be given the opportunity to respond to the allegations that have been made against you."  (ECF No. 95-2); (ECF No. 109-21).  Through counsel, Fritz responded by October 24, 2018, letter stating that she did not understand why she would be subject to *Loudermill* proceedings conducted by the County since she served the

---

[9] Fritz appealed the conviction and was found not guilty on August 22, 2019.  (ECF No. 108, p. 56); (ECF No. 115, p. 29). On September 25, 2019, she sought reinstatement to her position as Chief Deputy.  (ECF No. 96, p. 10); (ECF No. 108, p. 18).

[10] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

Sheriff pursuant to his statutory rights.  (ECF No. 95-3, p. 2); (ECF No. 109-22, p. 2).  Counsel

for Fritz went on to state in the letter:

> Chief Deputy Fritz challenges any form of adverse action by the County based upon a summary proceeding or the underlying facts.  She believes it to be clearly retaliatory and done for improper political purpose.  The conduct of the County is consistent with a pattern of retaliation and unlawful discrimination directed at Chief Deputy Fritz.
>
> Chief Deputy Fritz reiterates her request that the County imposed prohibition on her access to County property that directly interferes with her ability to complete the functions of Chief Deputy be removed.

(ECF No. 95-3, pp. 2-3); (ECF No. 109-22, pp. 2-3).  Nether Fritz nor her attorney appeared for

the October 25, 2018, *Loudermill* hearing.  Since Held delegated his Section 1620 rights, the

Commissioners made the decision to terminate Fritz's employment.  This was the first time an

elected official ceded his rights, and the Commissioners had to terminate an employee.  (ECF

No. 108, pp. 56-57); (ECF No. 115, pp. 30-33).

By letter dated October 25, 2018, the County terminated Fritz's employment effective

that day.  (ECF No. 95-1); (ECF No. 109-23).  In so doing, the County referenced the August 7,

2018, incident and its investigation, her criminal conviction, and "allegations of racial

discrimination made by several former County employees."  (ECF No. 95-1, p. 1); (ECF No.

109-23, p. 1).  The letter stated:

> We scheduled a hearing for today, October 25, 2018, to provide you with the opportunity to respond to the County's concerns about your employment.  Neither you or your attorney appeared.  As you are aware, the Westmoreland County Human Resources office received a number of complaints concerning possible physical violence on your part, as well as conduct unbecoming of a County employee.  Human Resources immediately began an internal investigation into these accusations.
>
> On August 7, 2018, it is alleged that you yelled at, pushed and poked an employee following a meeting.  It is also alleged that you blocked the employee from leaving the room.  It is alleged that you then yelled at and followed the employee through public areas.  On August 22, 2018, you were charged with a

14

citation for harassment.  On October 2, 2018, you were found guilty of a summary harassment charge stemming from this incident.

Our investigation concluded that your behavior constituted a violation of the Westmoreland County Workplace Violence Policy and the Westmoreland County Code of Ethics.  In addition, the behavior and charge of harassment is a violation of the Westmoreland County Sheriffs Policy Manual in regards to Article V, Section 2 and Section 4.

The County has a responsibility to take all reasonable steps to ensure that County security and workplace standards are upheld and to ensure the safety of County employees and visitors while on County property.

In addition to the concerns regarding the August 7, 2018 incident, the County is aware of allegations of racial discrimination made by several former County employees.  These concerns relate to a pattern of racial discrimination in hiring.  Today's meeting would have afforded you the opportunity to respond to these allegations.

While the County believes that you are an at-will employee, the County was willing to provide you with the opportunity to share information that you deemed to be relevant regarding these matters.  You deprived yourself of this opportunity by failing to attend our meeting.

Please be advised that Sheriff Held has delegated his Section 1620 rights to the County Commissioners for purposes of your employment due to a conflict of interest arising from the fact that Sheriff Held is a material witness to the August 7, 2018 incident.  Accordingly, this letter is to advise you that you are being terminated from your position effective immediately.

(ECF No. 95-1); (ECF No. 109-23).   On October 26, 2018, Held filed a Revocation of Deputation of Chief Deputy Patricia Fritz with the Prothonotary of Westmoreland County.  (ECF No. 95-19); (ECF No. 109-46).

Fritz was 63-years-old at the time of her termination.   On October 26, 2018, Held appointed a 51-year-old woman, Appleby, to the Chief Deputy Sheriff position vacated by Fritz. (ECF No. 108, pp. 62-63).

## II.   STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

"As a general proposition, conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Gonzalez,* 678 F.3d at 263 (internal quotation marks and citation omitted). *See also MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 485 n.6 (3d Cir. 2013) ("Summary judgment is proper only where the pleadings, discovery, and non-conclusory affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   ANALYSIS

The County seeks the entry of summary judgment in its favor as to all counts.  For the following reasons, the Court will grant the County's motion in its entirety.

### A.   Summary judgment will be entered in favor of the County as to Fritz's claims of sex discrimination (Counts I, VI and VIII).

Fritz contends that she had a statutory right to be free from sex discrimination in the terms and conditions of her employment, particularly with regard to the termination of her employment.  According to Fritz, her complaints of mistreatment were not investigated and she contends that the County did not preserve complaints from women.  Furthermore, Fritz argues that she was not offered an opportunity to resign, a last chance agreement, counseling or other opportunities that male employees were provided.  She takes umbrage with Felder never being banned from County property, and not suffering adverse employment consequences as a result of the August 7, 2018, incident.  In essence, Fritz argues that male employees were treated more favorably than she was in regards to disciplinary and personnel actions.  Fritz brings her claims under Title VII, the PHRA, and § 1983 (the equal protection clause).[11]

Where a plaintiff brings parallel claims of employment discrimination under Title VII, the PHRA, and § 1983 those claims are governed by the *McDonnell Douglas*[12] burden-shifting framework and, therefore, the Court will address them all together.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (explaining that the framework generally applies to claims under Title VII and the PHRA); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Lewis v.*

---

[11] Title VII and the PHRA prohibit an employer from discriminating on the basis of race. 42 U.S.C. § 2000e-2(a)(1); 43 P.S. § 955(a).  The Equal Protection Clause proscribes sex-based discrimination. *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992).

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (§ 1983 claims "require the same elements of proof as a Title VII action").   To establish a *prima facie* case of sex discrimination, a plaintiff must show (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action gave rise to an inference of unlawful discrimination, such as where the employer treated a similarly situated employee who was not a member of the plaintiff's protected class more favorably. *Jones*, 198 F.3d at 410–11.  Then, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802.  If the defendant produces a response, the burden shifts back to the plaintiff to show that the defendant's answer is merely a pretext for discrimination. *Id.* at 804–05.  "To discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken[.]"  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" that a reasonable jury could infer that the employer did not act because of the legitimate, non-discriminatory reason. *Id.*  A plaintiff can defeat summary judgment by demonstrating pretext in one of two ways: 1) by "point[ing] to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason[,]" *Burton v. Teleflex Inc.*, 707 F.3d 417, 430–31 (3d Cir. 2013) (citing *Fuentes*, 32 F.3d at 762), or 2) "pointing to evidence that indicates that the employer acted with discriminatory animus[,]" *id*. If proceeding by the first method, a plaintiff need not provide evidence that the employer acted

with animus, but rather only that the employer's rationale is "unworthy of credence[.]"   *Id.* (*quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)).

The County seemingly concedes that Fritz has met the first three elements of the test for a *prima facie* case of sex discrimination.   (ECF No. 97, pp. 10-12).   The Court agrees.   It would note that the only actual adverse employment action Fritz was subjected to was her suspension after the August 7, 2018, incident with Felder, and her October 25, 2018, termination.   As to the fourth element of the test for a *prima facie* case of sex discrimination, the County argues that the adverse employment actions do not give rise to an inference of unlawful discrimination.   Fritz responds that she has come forth with evidence that she was treated less favorably that male employees.

There are two ways to satisfy the fourth element: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [her] membership in a protected class and the adverse employment action." *Drummer v. Hosp. of Univ. of Pa.*, 455 F. Supp. 3d 160, 168 (E.D. Pa. 2020) (quoting *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014)); *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268–69 (3d Cir. 2010) (stating "comparative evidence is often highly probative of discrimination, [but] it is not an essential element of a plaintiff's case").   In essence, the question is whether Fritz can "point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [discrimination] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers*, 142 F.3d 639, 644–45  (3d Cir. 1998).

Although the Court of Appeals for the Third Circuit has not explicitly stated what constitutes a similarly situated employee, a panel of that court has stated that it "accept[s] the standard used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011) (citations omitted).  The panel further stated that "[a] determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.* at 882 (citations omitted).  This is consistent with a recent panel's statement in *Durst v. City of Phila.*, 798 F. App'x 710 (3d Cir. 2020) that "[a]lthough 'similarly situated' does not mean identically situated, the comparator must be similar in all relevant respects." *Id.* at 713 (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003)).  In *Durst*, the Third Circuit identified relevant factors to "include whether the comparators had the same supervisor, were subject to the same standards, and had engaged in similar conduct." *Id.*  "In the discipline context, a plaintiff must show that the alleged comparator's acts were of comparable seriousness to his own infraction, and that the [comparator] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or the employer's resulting treatment of [him]." *Johnson v. City of Phila.*, No. 14-1123, 2015 WL 1475277, at *12 (E.D. Pa. Apr. 1, 2015) (internal quotation marks and citation omitted); *see also Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 93 (3d Cir. 2020) ("Comparable seriousness may be shown by pointing to a violation of the same company rule, or to conduct of a similar nature." (internal quotation marks and citation omitted)).

The examination of comparator evidence is a case specific fact-intensive inquiry. *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004).  "Whether comparators are

similarly situated is generally a question of fact for the jury," but summary judgment is nevertheless appropriate "where there is no evidence from which a jury could conclude the parties were similarly situated." *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) (citations omitted); *see also Opsatnik, v. Norfolk S. Corp.*, 335 F. App'x. 220, 223–24 (affirming a grant of summary judgment because there was no evidence that comparators were similarly situated).   Here, the Court finds that Fritz has not met her burden using comparative evidence because she has not identified a comparator similarly situated to her in all respects. *See In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (employee failed to satisfy burden of showing that employer's stated reason for discharging him, for violating the company's anti-fighting policy, was pretext for discrimination); *see also Simpson*, 142 F.3d at 645 (explaining "[t]he plaintiff has the burden of demonstrating that similarly situated persons were treated differently").

Fritz argues that her suspension (and prohibition from entering County property) and termination was inconsistent with discipline directed at men in the Sheriff's Office.  A deputy, E.F., was suspended for three days after being accused of sexual harassment.  Another deputy, D.G., who admitted to receiving sexual favors from inmates, was permitted to resign.  A third deputy, R.N., who was facing charges of sexting with a minor, giving alcohol to minors, and engaging in sexual favors with inmates, was permitted to resign.  A fourth deputy, J.D., pled guilty to DUI-general impairment, and was issued a ten-day suspension (reduced to 5 days), and then put on a performance improvement plan for a probationary period.  A warrant deputy, A.H., tested positive for cocaine and was permitted to resign in lieu of termination.  Another deputy, B.M., who tested positive for alcohol, received a suspension.  Lastly, S.E., a deputy, revealed

confidential information and was permitted to resign in lieu of termination.  (ECF No. 96, pp. 25-27); (ECF No. 108, pp. 38-40; 58-60); (ECF No. 115, pp. 33-36).

While some of these allegations are disputed by the County (ECF No. 115, pp. 33-42), including the fact that anyone who received a suspension (like Felder) was automatically prohibited from being on County property (*Id.* at 39) (ECF No. 114, pp. 2-3), the real problem with regard to these comparators is that they all held different positions than Fritz.  She was second-in-command of the Sheriff's Office and the proffered comparators were merely deputies, and union employees at that.  *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) ("[A]n employee who holds a different job in a different department is not similarly situated." (citation omitted)); *Wilcher*, 441 F. App'x at 882 (finding that proposed comparators were inappropriate because "none of them held the same position" as plaintiff).  Also distinguishing her from her comparators, is that Fritz never requested to resign, or retire, prior to her termination.  In fact, she wanted to continue her tenure.  (ECF No. 96, p. 25); (ECF No. 108, p. 38).  As to the nature of the misconduct, Fritz has failed to identify who imposed the discipline on all the deputies.  She cannot establish an inference of discrimination where proposed comparators were disciplined by different supervisors.  And, most importantly, Fritz engaged in misconduct much different than the individuals she attempts to compare herself with.  She was convicted of criminal harassment against a subordinate on-site during work hours.  In this sense, she is not similarly situated to any of the individuals she references as comparators.  The County notes, "no other Chief Deputy and no one else in a similar position was retained after having been convicted of a summary offense of harassing another employee."  (ECF No. 114, p. 3). Fritz has proffered nothing to refute this statement.

The Court holds that Fritz has failed to demonstrate that other similarly situated individuals were treated any differently, regardless of sex.  She has come forth with no relevant comparator evidence giving rise to an inference of discriminatory intent.   Additionally, a reasonable factfinder also could not conclude there was a causal nexus between membership in a protected class (sex) and the adverse employment action.  As already noted, the County terminated her because (1) her behavior on August 7, 2018, violated the Workplace Violence Policy and the Code of Ethics and violated Article V, Sections 2 and 4 of the Sheriffs Policy Manual, (2) she was convicted of summary harassment, and (3) "allegations of racial discrimination made by several former County employees."   (ECF No. 109-23).   This termination decision was made after the County commissioned an independent investigation, and after Fritz was criminally convicted.   Although unnecessary, the County afforded Fritz a *Loudermill* hearing before terminating her, and she chose not to attend.  There is nothing in the record before the Court to suggest that the County's decision to terminate Fritz was gender based.  Fritz's bare allegations that her conditions of employment and termination were based on her sex are insufficient to withstand summary judgment; she has not set forth a *prima facie* case of sex discrimination. *See Williams v. Borough of West Chester Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989) (a "plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment" and it "must amount of more than a scintilla.").

Even if Fritz had established a *prima facie* case of sex discrimination by the County, summary judgment in favor of the County would still be appropriate because Fritz has failed to meet the shifting burden under *McDonnell Douglas* of adducing evidence sufficient for a factfinder to conclude that the employment action against her was pretextual. *McDonnell Douglas*, 411 U.S. at 802–04.  The County has asserted several nondiscriminatory reasons for the adverse

23

employment action against Fritz.   The Court finds that Fritz has failed to offer sufficient evidence that the County's reasoning was actually a pretext for discrimination.   The record is clear that Fritz was aware of pending disciplinary action and she chose not to attend the *Loudermill* hearing.   Fritz's denial to the Court that she engaged in the conduct with Felder that led to her criminal conviction and termination, and her reliance on deposition testimony of the Commissioners as to their spotty recollection of the exact reason for her termination, is insufficient to create a genuine issue of material fact, particularly in light of the series of letters sent to her by HR documenting its investigation and reasons for termination.   The issue of pretext addresses whether an employer honestly believes the reasons it offered for an employee's termination, not the correctness or desirability of its reasons.

Fritz failed to adduce evidence from which a reasonable factfinder could conclude "that the employer's proffered reasons were merely a pretext for discrimination," *Sarullo*, 352 F.3d at 797, or that there were "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that the Defendants' explanation is unworthy of credence, and hence infer that the employer did not act for the asserted" non-retaliatory reason, *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (quotation marks and citations omitted).   It is abundantly evident that Fritz disbelieves the County's reasons for terminating her employment, and she even goes so far as to posit that the discrimination complaints lodged against her were fabricated by disgruntled members of the Sheriff's Office.   But, she has come forth with nothing to demonstrate pretext.   Notably, after her termination, Fritz's position was filled by Held with another woman over the age of fifty.   There is no evidence in the record before the Court that justifies disbelieving the County's articulated legitimate reasons.   *Fuentes*, 32 F.3d at 764 (3d Cir. 1994).   In other words, Fritz has presented

no actual evidence to discredit the legitimate nondiscriminatory reasons for her suspension and then termination, and she has presented no evidence from which a fact finder could infer that the County's actions were motivated by discriminatory animus.

The Court holds that the County is entitled to summary judgment as a matter of law as to Counts I, VI and VIII.

### B. Summary judgment will be entered in favor of the County as to Fritz's claims of age discrimination (Counts III and VIII).

In Count III of her Amended Complaint, Fritz alleges age discrimination relative to her termination in violation of the ADEA.  In Count VIII, she alleges age discrimination relative to her termination in violation of the PHRA.[13]  Fritz, who was 63-years-old at the time of her termination, claims she was discriminated against when her position was filled by a 51-year-old woman with limited experience.  Summary judgment will be entered in favor of the County as the record is devoid of any evidence of age discrimination.

In cases like this one, where the plaintiff does not possess direct evidence of age discrimination, the Court must apply the three-part burden-shifting framework set forth in *McDonnell Douglas*, discussed above.  *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).  Under this test, Fritz bore the initial burden of establishing a *prima facie* case of discrimination.  *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir.

---

[13] The ADEA prohibits an employer from discharging an individual, or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual's age.  *See* 29 U.S.C. § 623(a)(1).  Similarly, the PHRA provides: "It shall be an unlawful discriminatory practice ... [f]or any employer because of the ... age ... of any individual ... to discharge from employment ... or to otherwise discriminate against such individual ... with respect to compensation, hire, tenure ... if the individual ... is the best able and most competent to perform the services required."  43 Pa. Stat. Ann. § 955(a).  The Court need not differentiate between Fritz's age discrimination claims under the ADEA and the PHRA because the same analysis is used for each claim.  *See Simpson*, 142 F.3d at 643 n.4; *see also Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021).  Fritz's claims will be addressed together.

2003). Generally, to establish a *prima facie* case of age discrimination, a plaintiff must prove the following elements: (1) she is 40 years of age or older; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than a sufficiently younger person under circumstances that give rise to an inference of age discrimination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)).

The County seemingly concedes for purposes of their motion that Fritz satisfied the first, second and third elements of the *prima faci*e test in that Fritz was 63-years-old at the time of her termination and she was qualified for her position as Chief Deputy Sheriff. (ECF No. 97, p. 18). As to the fourth element, the Court finds that Fritz has met her burden. She was replaced by a 51-year-old woman. Although they are both members of the ADEA protected age group, 29 U.S.C § 631(a), their shared protected status does not immunize the County against an inference of age discrimination. "[T]o satisfy the sufficiently younger standard, 'there is no particular age difference that must be shown, but ... courts have held ... that a five year difference can be sufficient [while] ... a one year difference cannot.'" *Monaco*, 359 F.3d at 307 (citing *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999)). The age difference here, twelve years, is sufficient for establishing a *prima facie* case. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (holding that when a 56–year old employee was replaced by a 40–year old employee, this qualified as someone "substantially younger" for the purposes of establishing a *prima facie* case); *Sempier v*, 45 F.3d at 730 (holding when an employee was temporarily replaced by a person who was 10 years younger and permanently replaced by a person four years younger, this was sufficient for the *prima facie* case).

Because Fritz carried the burden of establishing a *prima facie* case of age discrimination, the burden shifts to the County to "articulate some legitimate, nondiscriminatory reason" for its conduct. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The County, as discussed in the previous section herein, easily carried that burden, submitting ample evidence that Fritz was terminated because (1) her behavior on August 7, 2018, violated the Workplace Violence Policy and the Code of Ethics, and violated Article V, Sections 2 and 4 of the Sheriff's Policy Manual, (2) she was convicted of summary harassment, and (3) "allegations of racial discrimination made by several former County employees." (ECF No. 109-23). Therefore, the burden shifted back to Fritz to show that the County's explanation was pretextual, which she could do by providing evidence that would allow a factfinder to either (a) "disbelieve the employer's reason for the adverse employment action"; or (b) "believe that an invidious discriminatory reason was 'more likely than not a motivating or determinative cause' of the employer's action." *Fuentes*, 32 F.3d at 764. Fritz presented no evidence to make either showing. Her personal view that the County and Defendants were unfair to her and that Held should not have delegated his Section 1620 rights to the County does not suffice to show pretext. *See Sarullo*, 352 F.3d at 800; *see also Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim."). Fritz has produced no evidence of pretext other than the fact that she was replaced by a younger female employee. No reasonable factfinder could find that the County's offered reasons for terminating her were a pretext to discriminate against her on the basis of her age.

The Court holds that the County is entitled to summary judgment as a matter of law as to Counts III and VIII.

**C. Summary judgment will be entered in favor of the County as to Fritz's claim under the EPA (Count IV).**

In Count IV, Fritz alleges that the County violated the EPA in that it did not equalize her compensation with other male County employees.  To establish a *prima facie* case under the EPA, she must show that the County paid different wages to employees of the opposite sex for equal work on jobs which required equal skill, effort, and responsibility, and all of which are performed under similar working conditions.  *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000).  In other words, Fritz must show that she was paid unequally for "substantially equal" work.  *E.E.O.C. v. Delaware Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1413 (3d Cir. 1989). If a plaintiff, like Fritz, is able to make a *prima facie case*, the burden shifts to the employer to raise one of the four affirmative defenses stated in the EPA.  The four affirmative defenses include three that are "specific and one general catchall." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974).  A difference in payment between opposite sexes is permissible if it is made pursuant to: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a system based upon any other factor other than sex (the "catchall defense").  *Id.*

The Court finds that Fritz has failed to establish a *prima facie* case.  She has not come forth with adequate evidence demonstrating that "employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions."  *Stanziale*, 200 F.3d at 107.  To determine whether two jobs involve equal work, a court must determine whether "a significant portion of the two jobs is identical."  *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 155, 156 (3d Cir. 1985).

The Sheriff's Department had between forty-five and fifty-six employees.  Fritz's appointment was pursuant to Held's statutory authority as Sheriff under 16 P.S. § 1203,  and she

served at his pleasure.   Her annual salary, $41,675.87, was about the same as that of her predecessor.   She did not get overtime.   Her duties and responsibilities included managing the Sheriff's Office's budget, implementing and updating department policies in accordance with law and county guidelines, training new deputy units, and general managerial and supervisory duties.   (ECF No. 96, pp. 18, 23); (ECF No. 108, pp. 27, 36, 41-44); (ECF No. 115, pp. 2-4, 6).

The Chief Deputy Position was described as follows in March of 2017:

> Oversees the supervision of deputies; assigns and directs work including courtroom security, prisoner transportation, service of legal papers, sheriff sales, mental health cases, hospital security, warrant duty, prisoner medical visits and radio detail; reviews work and evaluates performance; reviews employee attendance and leave records.
>
> Dockets all writs, complaints and executions; notarizes foreign writs from other counties and states; distributes writs and complaints to deputies for service.
>
> Oversees the coordination of prisoner transfers from Courthouse to jail; oversees arrangements made for deputies to escort prisoners involved in extraditions.
>
> Oversees the transportation of prisoners; locates prisoners in the penal system, transfers to court hearings, hospital facilities, family funerals and any other court ordered appearances; reviews log of such transfers.
>
> Oversees and coordinates satellite gun permits, licenses to sell firearms and precious metals vendors to be sure all are compliant with guidelines.
>
> Oversees the maintenance program including car repairs, car radio repairs, etc. on all County Sheriff Department vehicles.
>
> Oversees confiscated weapons & areas where weapons are secured, stored and catalogued, such as the Sheriff's Department Gun Room.
>
> Responsible for all office functions and personnel; Chief Deputy acts as liaison in Sheriff's absence.
>
> Oversees budget requirements and guidelines regarding Sheriff's budget each fiscal year.
> Make recommendations for spending in regard to budgetary requirement.

(ECF No. 95-41).  The position required Act 2 Certifications through Deputy Training School or "an equivalent combination of training and experience which provides equivalent skills, knowledge and abilities," annual firearms certification, and five years of experience as a supervisor overseeing a staff.  (*Id.*).  Within one year of hire, the Chief Deputy must complete the Deputy Sheriff Academy.  (ECF No. 95-10, p. 8).  The position also has physical and mental requirements, but it does not require Act 120 certification.[14]  (ECF No. 95-10, p. 42); (ECF No. 95-41).  Because the Chief Deputy Sheriff position reported to a row officer, the Sheriff, only the Sheriff had the authority to mandate whether or not the Chief Deputy Sheriff was available twenty-four hours a day, seven days a week.  (*Id.*).

With the exception of the Chief of Staff for each of the three Commissioners, all row offices similar to the Sheriff's Office–i.e., the Treasurer, the Recorder of Deeds, the Register of Wills, the Coroner, the Prothonotary, and the Clerk of Courts–had Chief Deputy positions and those positions fell under the same pay step, or pay grade, as the Chief Deputy of the Sheriff's Office.  (ECF No. 95-10, pp. 10, 28-29); (ECF No. 95-39).  The County determined that these positions were equal and, thus, they all came in at a step 1 on the same grade, and the starting salary was approximately $42,000.  (ECF No. 95-10, pp. 10-13).  The only way to alter a Chief Deputy's step was if different work rules applied, if they were promoted to the Chief Deputy position from another County position that had a higher salary, or if the Salary Board gave an annual increase for all employees and it moved everyone over a step, which equated to a one percent salary increase.  (ECF No. 95-10, pp. 12-14).  The Chiefs of Staff for the Commissioners

---

[14]  To become a police officer in the Commonwealth of Pennsylvania, a candidate must successfully pass the Act 120 certification course as well as the Pennsylvania Municipal Police Officers' Education and Training Commission (MPOETC) state certified exam.  *See generally mpoetc.psp.pa.gov.*

were entitled to a pay grade above the Chief Deputy positions in the other row offices because of their expansive duties and responsibilities. (*Id.* at pp. 13, 28).

Despite all of this, Fritz argues that her position was more comparable to the men that held the positions of Chiefs of Staff for the Commissioners, the Prison Deputy Warden of Security, the Prison Deputy Warden of Treatment, and the Park Police Chief Deputy. (ECF No. 107, pp. 26-28). She claims that the Chief Deputies in the other row offices were positions not having a law enforcement aspect that were traditionally held by women. (ECF No. 107, p. 28). She believes the Chiefs of Staff for the Commissioners, the two prison wardens, and the Park Police Chief Deputy are comparable positions because they are supervisory/managerial positions. The Commissioners' Chiefs of Staff and the Deputy Prison Wardens had to be permanently on call like Fritz. As to the Park Police Chief Deputy, he, like Fritz, had to carry a firearm. Fritz argues that the positions are further comparable to her in that none required a bachelor's degree, and only the Prison Deputy Warden of Treatment required an associate degree. (*Id.*). For these reasons, Fritz posits that they are appropriate comparators, and they all earned approximately $10,000 to $27,734 more per year than she did.

The Court finds Fritz's comparator evidence to be deficient. Insufficient facts were adduced that the other positions she utilizes as comparators were actually equivalent to hers. The positions Fritz refers to–i.e., the Park Police Chief of Staff, the Deputy Wardens of the prison, and the three Chiefs of Staff to the Commissioners–are in different County departments, and they have vastly different job responsibilities and supervisors. Notably, there is no "Police Chief Deputy" position in the Park Police as the Police Chief is the top official for the Park Police and he oversees under fifty Park Police employees. The Park Police Chief requires Act 120 certification, at least five years of law enforcement experience, and other certifications. It is a

position that is more comparable to that of the Sheriff, Held. (ECF No. 95-10, pp. 5-7). Additionally, there is no "Chief Deputy" position at the Westmoreland County Prison. Instead, there are two Deputy Wardens that specialize in two different areas, one in security and one in treatment, and they are responsible for six hundred inmates and three hundred employees. They do not carry firearms, and they have to be permanently on-call. The Deputy Warden of Treatment is required to have a bachelor's degree, and the Deputy Warden of Security must have an associate degree, although a bachelor's degree is preferred. For all of the Deputy Warden positions, several years of corrections or law enforcement experience is required as well as prior management and/or supervisory authority. (*Id.* at pp. 6-7). As to the three Chiefs of Staff for each of the Commissioners, they each are responsible for oversight and guidance of five to six departments (there are a total of thirty-one County departments). Their jobs are expansive and include such things as:

1. Assists the Board of Commissioners in establishing policies, goals, program planning, and fiscal initiative; insures that Department Heads implement the Board of Commissioners' decisions.
2. Interacts with all Row Officers and the Courts, to coordinate program planning, fiscal matters and other issues affecting these offices and courts.
3. Interacts and participates in planning with State and Federal agencies, legislators, lobbyists and constituents for County growth, development and funding opportunities.
4. Provides information and answers questions from constituents.
5. Assists Financial Administration in leading the development and preparation of the County budget.
6. Assists with researching and developing policies and procedures to better serve the Board of Commissioners.
7. Meets with Department Heads to discuss, debate, trouble-shoot, and brainstorm personnel, program and operational problems to identify potential solutions. Oversees and assigns tasks to Department Heads with the approval of two commissioners.
8. Participates and provides assistance in developing answers to lawsuit filed against the County.
9. Interacts and communicates with their County Commissioner and interacts with other Commissioners to gain approval and consensus on policies, initiatives and projects.

10. Attends Salary Board, Prison Board, Pension Board and other public meetings.

(ECF No. 95-40).  They have the authority to recommend personnel action, discipline, and termination in consultation with the department head.  (ECF No. 95-10, p. 10).  A bachelor's degree is required, three to five years' experience in public policy and administration is required, and supervisory experience is preferred.

Not only has Fritz failed to adduce evidence that the qualifications for these positions was similar to that of the Chief Deputy Sheriff, but she has failed to present concrete evidence that the work done by any of these men was of a "substantially equal skill, effort and responsibility, under similar working conditions."  *Stanziale*, 200 F.3d at 107.  She has not set forth a *prima facie* case that the County paid her differently from male coworkers in other County departments for performing equal work.  As the evidence currently stands, she was paid the same as her predecessor and her salary was set the same as the Chief Deputies in other row offices.

For these reasons, summary judgment will be entered in favor of the Sheriff's Office as to Count IV.

### D. Summary judgment will be entered in favor of the County as to Fritz's claims of retaliation (Counts II, V and VIII).

In Count II, Fritz brings a retaliation claim against the County under Title VII for engaging in protected conduct by filing an EEOC complaint (which was later amended) as well as a complaint with the County Solicitor regarding her February 7, 2018, incident with Regoli. She also claims she "engaged in protected activity by addressing the disparity in pay with her male peers."  (ECF No. 26, p. 19).  As a result of engaging in this allegedly protected activity, Fritz contends she was subjected to retaliatory behavior by the Sheriff's Office including, but not limited to, discipline and termination.  (*Id.* at p. 20).  In Count V, she brings a retaliation claim

against the County under the EPA because, after voicing her concerns regarding her disparity in pay with other Chief Deputies in the County, "Defendants not only denied the equal compensation but undertook a pattern and practice aimed at compelling her discharge from employment." (*Id.* at p. 25). Lastly, in Count VIII, she brings a retaliation claim under the PHRA against the County alleging that it engaged in "employment decisions" "that were discriminatory in intent and practice by treating her differently in the terms and conditions of her employment compared to male employees," and retaliated against her internal complaints and filing of a PHRA complaint through "compensation, threats of physical violence, unfounded and disparate disciplinary conduct, and termination of employment." (*Id.* at p. 35). In her pleadings to the Court, she clarifies that her claims under these provisions are for the County's retaliation in response to complaints of discrimination as to compensation, personnel action, and disciplinary action.[15]  (ECF No. 107, pp. 29-35). She made complaints of discrimination both internally with Held and HR and externally with the EEOC and PHRC. Fritz argues that the adverse employment action was her suspension (including banishment from County property) and termination. (*Id.*).

---

[15] Section 704(a) of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation ... under this subchapter." 42 U.S.C. § 2000e–3(a). It is similarly unlawful under § 5(d) of the PHRA for an employer "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge ... under this act." 43 Pa.S. § 955(d). Under the FLSA, it is prohibited to retaliate against any employee who files a complaint, commences a proceeding, or testifies in a proceeding under the FLSA, including the EPA. 29 U.S.C. § 215(a)(3).

In order to establish a *prima facie* case of retaliation,[16] Fritz must show that (1) she was engaged in protected activity; (2) the County took adverse employment action against her; and (3) a causal nexus exists between the protected activity and the adverse employment action. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). If Fritz is able to show these elements, the burden shifts to the County to articulate a legitimate, non-discriminatory reason for its action. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003). If the County satisfies this burden, Fritz may defeat summary judgment by discrediting the proffered reason or adducing evidence to demonstrate that retaliatory animus was a motivating factor in the County's decision. *Fuentes*, 32 F.3d at 765.

The County argues that Fritz has failed to satisfy the third prong of the test for a *prima facie* case of retaliation. (ECF No. 97, pp. 15-16). The Court concurs. Fritz has failed to adduce sufficient evidence to demonstrate the element of causation. A plaintiff may show causation in any of the following three manners: (1) by the timing of the adverse action in relation to the protected activity;[17] (2) by a *pattern of animus* during the interval between the protected activity and the adverse action; or (3) through other circumstantial evidence concerning the employer's motivation, including inconsistent reasons given by the employer for terminating the employee

---

[16] Retaliation claims under Title VII, the PHRA, and the EPA are all analyzed using the same framework. *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567 (3d Cir. 2002); *see also Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 939 (3d Cir. 2003) (citing *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).

[17] "[I]t is causation, not temporal proximity itself, that is an element of [a] plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar*, 109 F.3d at 178. Determining whether temporal proximity alone may create an inference of retaliation is "essentially fact-based ... depending ... on how proximate the events actually were, and the context in which the issue came before us." *Farrell*, 206 F.3d at 279.

or the employer's treatment of other employees.  *Theriault v. Dollar Gen.*, 336 F. App'x 172, 175 (3d Cir. 2009).  Thus, in proving a causal link between protected activity and adverse action, plaintiffs may rely on "a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).

Held unsuccessfully sought salary increases for Fritz on March 6, 2017 and January 24, 2018.  Fritz made an internal complaint on February 7, 2018, after an incident with Regoli wherein she alleged he physically assaulted her and his conduct violated the County's Workplace Violence Policy.  That same month, she filed external complaints - an EEOC complaint on February 21, 2018, against the three Commissioners and Regoli as well as a complaint with the Pennsylvania Office of Disciplinary Counsel against Regoli.  Her complaints were based on the February 7, 2018 meeting/incident with Regoli.  On February 21, 2018, she filed a complaint with PHRC against all three commissioners and Regoli.  In March 2018, she amended her EEOC complaint to include a claim of unequal pay based on gender discrimination.  In June 2018, Fritz supplemented her EEOC charge to include claims of sex discrimination and equal pay.  Then, almost six months later, Fritz was suspended with pay on August 10, 2018, after the August 7, 2018, incident with Felder while the County conducted its independent investigation of the incident.[18]  On October 25, 2018, the County terminated Fritz's employment after concluding its investigation into the events of August 7, 2019, and learning of her October 2, 2018, criminal conviction.

---

[18] The Court agrees with the County that any complaints of discrimination and/or retaliation by Fritz made after the August 7, 2018, incident are not protected activity. (*See* ECF No. 97, pp. 14-15).  Fritz seems to acknowledge this point as her argument regarding her protected activity relates solely to her request for equal compensation and then filing complaints of discrimination, both internally with HR and externally with the EEOC and PHRC, as to what occurred with Regoli on February 7, 2018, as well as her allegedly unequal pay. (ECF No. 107, p. 30).

The Court finds that this timing is not in and of itself unduly suggestive of retaliation in the particular factual circumstances of this case. *See McLaughlin v. Fisher*, 277 F. App'x 207, 218 (3d Cir. 2008) (timing alone "ordinarily is insufficient to demonstrate a causal link unless the timing is 'unusually suggestive' of retaliatory motive."). Since the temporal proximity is not so close as to be unduly suggestive, the Court must look to other types of circumstantial evidence that may give rise to the inference of causation.

The record is devoid of any evidence of a pattern of animus by the County during the interval between Fritz filing her February 2018 complaints (and subsequent amendments) and being terminated. The only evidence she has adduced is that the Commissioners, in a February 9, 2018 letter, prior to Fritz filing her external complaints, requested Held suspend Fritz due to the discrimination complaints on the basis that the County's Non-Discrimination Policy stated that employees who allegedly conducted themselves in a discriminatory manner were to be "indefinitely suspended pending the outcome of the investigation." The Commissioners also released a statement to the media requesting Fritz's suspension. Held refused to suspend Fritz. (ECF No. 95-28); (ECF No. 96, pp. 15-16); (ECF No. 108, pp. 23-24, 49); (ECF No. 115, pp. 14, 16). Then, on March 27, 2018, the Commissioners wrote to Pennsylvania senators and requested Fritz's removal from office based on the discrimination complaints pending against her. No senators investigated or took action on the Commissioners' request. (ECF No. 108, p. 50); (ECF No. 115, pp. 17, 39-42). These events do not demonstrate any animus on the part of Held or the Sheriff's Office for Fritz filing EEOC and PHRC complaints the prior month. Notably, the County never completed its investigation into the discrimination complaints against Fritz because the complaining individuals filed federal lawsuits that the County ultimately settled. (ECF No. 96, pp. 11-17); (ECF No. 108, pp. 18-26); (ECF No. 115, pp. 10-14, 17). There is

absolutely no evidence in the record that the County displayed any animus towards Fritz as a result of having to settle lawsuits involving her workplace conduct.

To the extent Fritz believes there was "a clear pattern of antagonism" directed at her and that the County was trying to push "its retaliatory agenda" of terminating her, there are insufficient facts in the record to support her theory. Other than the aforementioned events in March 2018, the record reveals that the County conducted an investigation into Fritz's allegations against Regoli, which Held classified as a complaint of workplace harassment. The County pulled surveillance video footage as to Fritz's movements on February 7, 9 and 11, 2018. (ECF No. 108, p. 48); (ECF No. 115, p. 15). The County also hired Attorney McGinnis to investigate. When he attempted to interview Fritz, she referred him to her attorney, and Attorney McGinnis was never able to interview Fritz. Attorney McGinnis issued a June 28, 2018, report detailing his investigation and conclusion that Regoli had not violated the County's Sexual Harassment or Violence in the Workplace policies. He noted that Fritz's refusal to be interviewed was a potential violation of the County's Sexual Harassment Policy, and she violated the Violence in the Workplace Policy by failing to immediately report to HR or the Park Police the alleged physical contact with Solicitor Regoli. (ECF No. 95-29); (ECF No. 96, pp. 16-17); (ECF No. 108, pp. 24-26). Yet, the County took no action against Fritz for violations of County policy; in fact, it appears that the County never addressed Attorney McGinnis's report or conclusions with her.

Fritz has not come forth with evidence that connects the dots between her complaints, her suspension for the August 7, 2018 incident with Felder, and her termination. *See Christman v. Cigas Mach. Shop, Inc.*, 293 F. Supp. 2d 538, 544 (E.D. Pa. 2003) ("A plaintiff must produce at least some evidence that connects the dots between her claim for workers' compensation and her

termination, such as adverse personnel action promptly after her workers' compensation claim was made, statements by supervisors referencing her claim, documents from the employer discussing her claim with respect to her termination, etc." (quoting *Landmesser v. United Air Lines*, 102 F. Supp. 2d 272, 278 (E.D. Pa. 2000)).  While she makes broad sweeping statements like, "the Commissioners sought guidance on how to remove [Fritz] while Sheriff Held retained his Section 1620 rights," and the "evidence shows a sustained effort over several months to have her removed from her office through a myriad of means," there is no supporting evidence in the record for her theories.  She casts shade upon the County's investigation into her August 7, 2018, interaction with Felder, and argues that Held's relinquishment of Section 1620 rights allowed the County "to advance their discriminatory and retaliatory mission," but the facts in the record show no such thing.  What the County was faced with were three separate events involving Fritz–i.e., (1) discrimination complaints in early 2018 leading to lawsuits; (2) a February 7, 2018, interaction with Regoli; and (3) an August 7, 2018 incident with Felder that resulted in a criminal conviction for Fritz–but, nothing in the record connects all of this together and evinces a pattern of animus.  There is no circumstantial evidence in the record concerning any other motivation for the County's termination of Fritz other than the reasons provided to her, that 1) her behavior on August 7, 2018 violated the Workplace Violence Policy and the Code of Ethics and violated Article V, Sections 2 and 4 of the Sheriffs Policy Manual, (2) she was convicted of summary harassment, and (3) "allegations of racial discrimination made by several former County employees." (ECF No. 109-23, p. 3).

Even if Fritz had put forth sufficient evidence of a causal connection between her complaints and her termination, the County is entitled to summary judgment because it has come forth with legitimate, non-discriminatory reasons for why it terminated Fritz that she has not

shown are pretextual.  As outlined in the previous sections and incorporated herein, there is no genuine dispute of material fact as to whether the County's reasons for suspending Fritz and then terminating her employment were pretextual.  Fritz has failed to present evidence from which a reasonable fact finder could conclude that the County's legitimate, nondiscriminatory reasons for her termination were a pretext for retaliation by the County.

The Court holds that the County is entitled to summary judgment as a matter of law as to Fritz's retaliation claims.

## IV.   CONCLUSION

For the foregoing reasons of law and fact, the Court will grant the County's motion and enter summary judgment in their favor.  Orders of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

September 26, 2022
Date